**MORGAN, LEWIS & BOCKIUS LLP**
Brandon J. Brigham (NJ ID # 02235-2009)
2222 Market Street
Philadelphia, PA 19103
(215) 963-4780
brandon.brigham@morganlewis.com

*Attorneys For Plaintiff Kenric Steel, LLC*

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| KENRIC STEEL, LLC,<br>331 Riverside Drive,<br>Millville, NJ 08332<br><br>        Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br>OCCUPATIONAL SAFETY AND HEALTH<br>ADMINISTRATION<br>200 Constitution Ave N.W.,<br>Washington, DC 20210;<br><br>JULIE A. SU, in her official capacity as Acting<br>Secretary of Labor<br>200 Constitution Ave N.W.,<br>Washington, DC 20210;<br><br>SEEMA NANDA, in her official capacity as the<br>Solicitor of Labor<br>200 Constitution Avenue, N.W., Room N2420,<br>Washington, DC 20210;<br><br>THE OCCUPATIONAL SAFETY AND<br>HEALTH REVIEW COMMISSION<br>120 20th St., N.W., 9th Floor,<br>Washington, DC 20036;<br><br>CYNTHIA ATTWOOD, in her official capacity<br>as Chairperson of the Occupational Safety and<br>Health Review Commission<br>120 20th St., NW, 9th Floor,<br>Washington, DC 20036; and | Civil Action No. |

PATRICK B. AUGUSTINE, in his official
capacity as Administrative Law Judge of the
Occupational Safety and Health Review
Commission,
721 19th Street, Room 407
Denver, CO 80202-2517

        Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Kenric Steel, LLC ("Kenric Steel") brings this action for declaratory and injunctive relief, alleging as follows:

### INTRODUCTION

1.      The U.S. Acting Secretary of Labor (the "Secretary"), acting through the U.S. Solicitor of Labor (the "Solicitor"), is pursuing an unconstitutional and illegal administrative proceeding against Kenric Steel (the "OSHRC Proceeding") for the reasons described below.

2.      In 1970, Congress enacted the Occupational Safety and Health Act ("OSH Act"), 84 Stat. 1590, 29 U.S.C. §§ 651 *et seq.*

3.      The Secretary delegated some of her duties under the OSH Act, including the ability to inspect workplaces and issue citations to employers for violations of the OSH Act and its attendant standards and regulations, to the Occupational Safety and Health Administration ("OSHA").

4.      To be clear, and contrary to how OSHA has portrayed the company in the press, Kenric Steel believes that OSHA plays an important role in society by helping to assure the safe and healthful working conditions of employees.

5.      In fact, Kenric Steel is committed to ensuring the safety of its employees and all individuals at its sites. It is constantly investing in safety so that it can continuously improve.

6.      That being said, Kenric Steel also agrees with the Founders of this nation and Framers of the Constitution who appropriately feared the centralization of power in any one branch of government.

7.      In the words of James Madison: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." *The Federalist* No. 47 (James Madison).

8.      Or, as Alexander Hamilton wrote in *The Federalist Papers*, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" *The Federalist* No. 78 (Alexander Hamilton), at 466 (quoting 1 Montesquieu, *The Spirit of Laws* 181 (10th ed. 1773)).

9.      For the reasons described below, when Congress enacted the OSH Act it violated that very principle by placing both executive power—the power to enforce the law—and judicial power—the power to render judgments about the application of the law—in the hands of the Executive Branch.

10.     Specifically, in addition to empowering the Secretary to enforce the OSH Act, that law created the Occupational Safety and Health Review Commission (the "Review Commission" or "OSHRC"). 29 U.S.C. §§ 657-59, 661.

11.     The Review Commission contends that it "is an independent federal agency that is not part of the Department of Labor or OSHA." www.oshrc.gov (last visited Sept. 15, 2024)

12.     The Review Commission decides the validity of citations, including the proposed penalties and abatement included in those citations, that the Secretary, through OSHA, issues to employers following inspections of American workplaces.

- 3 -

13.     The Review Commission also asserts that it "functions as a two-tiered administrative court, with established procedures for (1) conducting hearings, receiving evidence, and rendering decisions by its Administrative Law Judges (ALJs) and (2) discretionary review of ALJ decisions by a panel of Commissioners." www.oshrc.gov (last visited Sept. 15, 2024).

14.     The Review Commission describes itself as a "court" because it exercises judicial power.

15.     Judicial power is the power "of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." Justice Samuel Miller, *On The Constitution* 314 (1891).

16.     In other words, it is "the right to determine actual controversies arising between diverse litigants, duly instituted in courts of proper jurisdiction." *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

17.     That is exactly what the Review Commission does: it determines an actual controversy arising between the Secretary and employers, pronounces its judgment, and it has that power because Congress conferred that jurisdiction to it.

18.     When Congress placed the Review Commission inside the Executive Branch, it was neither the first time nor the last time it improperly conferred judicial power upon that branch.

19.     For example, Congress established in 1934 the Board of Tax Appeals (the "Board") as a purported independent agency in the Executive Branch to permit taxpayers to challenge determinations made by the Internal Revenue Service of their tax liabilities before payment. In 1942, Congress changed the name of the Board to the "Tax Court of the United

States," but the Tax Court of the United States remained a purported independent agency in the Executive Branch. And in the Tax Reform Act of 1969, Congress recognized its error and reconstituted the Tax Court of the United States as the United States Tax Court (the "Tax Court") and repealed the statutory designation of the Tax Court as an Executive Branch agency. 26 U.S.C. § 7441.

20.     More recently, Congress empowered the Securities and Exchange Commission ("SEC"), another federal agency, to both prosecute and adjudicate violations of three antifraud provisions of the Securities Exchange Act. 15 U.S.C. §§ 77h–1, 78u–2, 78u–3, 80b–3. On June 27, 2024, the U.S. Supreme Court held that conferral of judicial power to the Executive Branch violated the Constitution. *See SEC v. Jarkesy*, 144 S. Ct. 2117, 2139 (2024).

21.     Because Congress determined that the Review Commission was to be part of the Executive Branch, as opposed to the Judicial Branch, the structure of the Review Commission violates the U.S. Constitution in multiple ways.

22.     ***First***, because it is purportedly an executive agency, Members of the Review Commission are unconstitutionally insulated from removal.

23.     Article II vests all executive power in the President, "who must 'take Care that the Laws be faithfully executed.'" *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020).

24.     To discharge that responsibility, the President must have the power to appoint and remove subordinate officers who assist in carrying out the President's duties. *Free Enter. Fund v. PCAOB,* 561 U.S. 477, 513–14 (2010).

25.     Review Commission Members, however, serve six-year terms and "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 29 U.S.C. § 661(b).

26.     Review Commission Members' terms are also staggered in two-year increments.
*Id.*

27.     As a result, assuming Review Commission Members serve their full terms, a
President may only appoint two Review Commission Members during that President's first term.
Similarly, again assuming Review Commission Members serve their full terms, the Review
Commission may be composed of two individuals appointed by the President's predecessor for
two years or more. During that time, the President's predecessor would, in essence, have set the
policy and direction of the Review Commission because the Review Commission cannot take
official action without the vote of at least two Review Commission Members. 29 U.S.C. §
661(f).

28.     Neither the Third Circuit nor the Supreme Court has decided whether the Review
Commission Members' layer of removal protection or their staggered terms is unconstitutional.
Given the relevant Supreme Court precedent regarding removal restrictions on executive
officers, they should be.

29.     The existence of unconstitutional removal protections and staggered term limits
inflicts twofold harm. It limits the President's constitutional authority, of course. But it also
produces an administrative bureaucracy that operates on regulated parties without the
constitutionally required "degree of electoral accountability." *Collins v. Yellen*, 594 U.S. 220,
252 (2021).

30.     Because such removal protections affect not just the President, but also ordinary
Americans who must interact with the administrative state, it makes no legal difference whether
the President objects to a given statutory limit on his removal powers: "the separation of powers

does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" *Free Enter. Fund*, 561 U.S. at 497 (citations omitted).

31.     When a party is regulated by administrative officials who are shielded by unconstitutional removal protections, Supreme Court precedent teaches that the party is "entitled to declaratory relief sufficient to ensure that the [administrative] standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Id.* at 513.

32.     To prevent Kenric Steel from undergoing protracted administrative proceedings before an unconstitutionally structured agency—after which Kenric Steel is unlikely to have a chance to secure meaningful retrospective relief—the Court should stay or enjoin the current agency proceedings, declare that the Review Commission's structure violates the separation of powers under Article II of the Constitution, and permanently enjoin the Review Commission, the Secretary, and the Solicitor from seeking to enforce citations against Kenric Steel before agency officials that are unconstitutionally insulated from presidential oversight.

33.     ***Second***, the Review Commission's ALJs are unconstitutionally appointed and, once appointed, unconstitutionally insulated from removal.

34.     In fact, the Framers considered "the power of appointment to offices" to be "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (citation and internal quotations omitted). To prevent the "manipulation of official appointments," *id.*, the Framers "carefully husband[ed] the appointment power" to "limit its diffusion," *id.* at 883, and to ensure that "all … officers of the Union, will … be the choice, though a remote choice, of the people themselves." *The Federalist* No. 39 (James Madison), at 271 (Cynthia B. Johnson ed., 2006).

35.    Principal Officers—such as ambassadors, judges, and department heads—must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2. Congress may, however, "vest the Appointment of such inferior Officers … in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* "Unless their selection is elsewhere provided for" in the Constitution—as with the President himself—every federal official whose position is "'established by Law'" and who exercises "significant authority" must be appointed under the Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 118, 126, 132 (1976) (per curiam) (citation omitted).

36.    Supreme Court precedents make clear that the category of constitutional "Officers" includes adjudicators, like Review Commission ALJs, who decide the rights of citizens under federal law. First in *Freytag v. Commissioner*, 501 U.S. 868, 882 (1991), the Supreme Court held that "special trial judges" ("STJs") of the United States Tax Court who presided over adversarial hearings, which are very similar to Review Commission proceedings, were inferior Officers. Then in *Lucia v. Securities Exchange Commission*, 585 U.S. 237, 248-50 (2018), the Supreme Court applied the reasoning of *Freytag* and held that SEC ALJs were also inferior Officers.

37.    While *Freytag* addressed only STJs and *Lucia* concerned only SEC ALJs, courts have extended their holdings to numerous agencies' ALJs. *See, e.g.*, *Bank of Louisiana v. FDIC*, 919 F.3d 916, 925-30 (5th Cir. 2019) (FDIC ALJs); *Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 679 (6th Cir. 2018) (Department of Labor, Mine Safety and Health Review Commission ALJs); *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018) (Department of Labor, Benefits Review Board ALJs).

38.     Review Commission ALJs perform very similar duties to those of STJs and SEC ALJs. They "hold a continuing office established by law." *Lucia*, 585 U.S. at 246; 29 U.S.C. § 661. They can "both hear and definitively resolve a case for" the Commission. *Lucia*, 585 U.S. at 246; 29 U.S.C. § 661(j) (noting Commission ALJs "shall hear, and make a determination upon, any proceeding instituted before the Commission"). "Still more, the Commission's ALJs exercise the same significant discretion when carrying out the same important functions as STJs do." *Lucia*, 585 U.S. at 246 (internal quotation and citation omitted). Among other similarities, "the Commission's ALJs have equivalent duties and powers as STJs in conducting adversarial inquiries." *Id.*; *see also* 29 U.S.C. § 661. Thus, Review Commission ALJs are Officers within the meaning of the Appointments Clause.

39.     The appointment process for Review Commission ALJs, however, violates the Constitution.

40.     The Appointments Clause establishes the "exclusive method by which those charged with executing the laws of the United States may be chosen." *Buckley*, 424 U.S. at 118, 125. The clause is a critical safeguard to ensure that members in the Executive Branch follow the will of the people.

41.     At bottom, "the President alone," "the Courts of Law," or one of the "the Heads of Departments" must have appointed OSHRC ALJs. U.S. Const. art. 2, §2.

42.     Contrary to that command, the OSH Act confers power solely on the Review Commission Chairperson to "appoint such administrative law judges and other employees as he deems necessary . . . ." 29 U.S.C. § 661(e). And the Review Commission Chairperson is not an entity or individual granted appointment power by the Appointments Clause.

43.     Of course, the Review Commission Chairperson is not the President.

44.    Neither is she a "Court of Law" or the "Head of a Department."

45.    The Review Commission identifies itself as an independent federal agency, *see* www.oshrc.gov (last visited Sept. 15, 2024), and the Administrative Procedures Act makes clear that an "agency," like the Review Commission, cannot be a court of the United States, *see* 5 U.S.C. § 551(1). Thus, the Review Commission Chairperson, nor even OSHRC itself, is a "Court of Law" as currently constructed, an issue Congress could easily remedy like it did with the Tax Court.

46.    Further, the Supreme Court's reasoning in both *Freytag* and *Free Enterprise Fund* establishes that the Review Commission Chairperson is also not the "Head of a Department." In *Freytag*, the Supreme Court held that the Chief Judge of the Tax Court—who had power to appoint STJs—was not the Head of a Department. It explained that "for more than a century [it] has held that the term Department refers only to 'a part or division of the executive government, as the Department of State, or of the Treasury,' expressly 'created and given the name of a department' by Congress." *Freytag*, 501 U.S. at 886 (cleaned up and citing *United States v. Germaine*, 99 U.S. 508, 511 (1878)); *see also Burnap v. United States*, 252 U.S. 512, 515 (1920) ("The term 'head of a department' means . . . the Secretary in charge of a great division of the executive branch of the government, like the State, Treasury, and War, who is a member of the Cabinet."). Because the Tax Court did not fall within this definition, in part because it only performed adjudicatory functions, like the Review Commission, the Supreme Court held that the Chief Judge of the Tax Court could not be the Head of a Department. *Freytag*, 501 U.S. at 886.

47.    A similar conclusion is warranted here. OSHRC was neither "expressly 'created and given the name of a department' by Congress" nor is the Review Commission Chairperson "in charge of a great division of the executive branch of the government, like the State, Treasury,

[] War," Labor, Education, and so on. Instead, she is but one member of a multimember adjudicatory agency and, unlike the Secretary of any "great division" of the Executive Branch, her powers are limited to overseeing "the administrative operations of the Commission" and appointing "such administrative law judges and other employees as [s]he deems necessary to assist in the performance of the Commission's functions." 29 U.S.C. § 661(e). In fact, and as noted above, the Review Commission Chairperson cannot take any "official" Commission action without the vote of at least one other Commissioner.[1] 29 U.S.C. § 661(f). *Freytag's* definition of the Head of a Department simply cannot be squared with the Review Commission Chairperson's duties and powers.

48.    The Supreme Court further cemented that the Review Commission Chairperson cannot be a Head of a Department in *Free Enterprise Fund*. There, the Supreme Court held that a "principal agency," such as the SEC, is a Department under the Appointments Clause. *Free Enter. Fund*, 561 U.S. at 510. Nevertheless, it also concluded that the SEC Chairman was ***not*** the "Head" of the SEC for purposes of the Appointment Clause. *Id.* Instead, the Court held that only the "full Commission" could exercise that "Department's" Appointments Clause power. *Id.* The Supreme Court based its ruling that the full Commission was the "Head of the Department" on two facts identical to those here: (1) the SEC's powers are "generally vested in the Commissioners jointly, not the Chairman alone," *id.*, just like the Review Commission's powers are, *see* 29 U.S.C. § 661(f); and, (2) the SEC's "Chairman is also appointed from among the Commissioners by the President alone," 561 U.S. at 510, just like the Review Commission's Chairperson is, *see* 29 U.S.C. § 661(a). Thus, even assuming *arguendo* that the Review

---

[1]    The OSH Act creates a dichotomy between "administrative" and "official" Review Commission actions. 29 U.S.C. § 661. The Chairperson is empowered only to take "administrative" actions, which purportedly include appointment of ALJs.

Commission qualifies as a "principal agency" like the SEC, only the "full Commission" could exercise its Appointments Clause power. The OSH Act, however, vests that power solely in the Chairperson. 29 U.S.C. § 661(e). That cannot be so under the Constitution.

49.    To be clear, Kenric Steel's position is that the Review Commission is not a principal agency given its solely adjudicatory function.  Indeed, the Supreme Court's analysis under *Freytag* compels that result.  The Supreme Court has repeatedly outlined how the Review Commission differs from "principal agencies" like the SEC. For example, in *Martin v. OSHRC*, the Court noted the "unusual regulatory structure established by" the OSH Act. 499 U.S. 144, 151 (1991). It explained:

> Under most regulatory schemes, rulemaking, enforcement, and adjudicative powers are combined in a single administrative authority. *See*, *e.g.*, 15 U.S.C. § 41 *et seq*. (Federal Trade Commission); 15 U.S.C. §§ 77s–77u (Securities and Exchange Commission); 47 U.S.C. § 151 *et seq*. (Federal Communications Commission). Under the OSH Act, however, Congress separated enforcement and rulemaking powers from adjudicative powers, assigning these respective functions to two different administrative authorities.

*Id.* Thus, the Review Commission does not even qualify as a "principal agency" since it lacks rulemaking and enforcement powers.

50.    Once appointed, Review Commission ALJs are also unconstitutionally insulated from removal.

51.    In fact, three different layers of removal protections impede the President's ability to remove Review Commission ALJs: (1) while the Review Commission may take steps to remove an ALJ, it may do so "only for good cause established and determined by the Merit Systems Protection Board [("MSPB")]," 5 U.S.C. § 7521(a); (2) the President may remove members of the MSPB only for "inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d); and, (3) the President may remove Review Commission Members only for

"inefficiency, neglect of duty, or malfeasance in office." 29 U.S.C. § 661(b). Courts have held

that matching sets of removal restrictions pertaining to ALJs of other agencies, including the

SEC, the National Labor Relations Board ("NLRB"), and others are unconstitutional. The same

conclusion follows here.

52.     Indeed, Supreme Court precedent establishes that multi-layer removal protection

violates Article II because it "not only protects [the inferior Officers] from removal except for

good cause, but withdraws from the President any decision on whether that good cause exists."

*Free Enter.*, 561 U.S. at 495. The Supreme Court reasoned:

> A second level of tenure protection changes the nature of the
> President's review. Now the Commission cannot remove [inferior
> Officers] at will. The President therefore cannot hold the
> Commission fully accountable for the [inferior Officers'] conduct,
> to the same extent that he may hold the Commission accountable for
> everything else that it does. The Commissioners are not responsible
> for the [inferior Officers'] actions.

*Id.*

53.     The Supreme Court concluded that these removal protections rendered the

President "powerless to intervene" if he disagreed with those inferior Officers' actions, even with

"the Commission" being able to overturn those inferior Officers' actions. The Supreme Court

further reasoned that, due to this multi-level tenure protection, "the Commission" could only be

responsible for its own actions, not those of its inferior Officers. *Id.* "And even if the President

disagrees" with "the Commission's" actions, "he is powerless to intervene—unless that

determination is so unreasonable as to constitute 'inefficiency, neglect of duty, or malfeasance in

office.'" *Id.* (quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 620 (1935)). As a

result, the Supreme Court held that these dual-layer statutory removal restrictions were

unconstitutional. *Id.*

54. Courts have applied the Supreme Court's reasoning in *Free Enterprise* to federal agencies' ALJs and found that their removal protection violates the Constitution. For example, in *Jarkesy v. SEC*, the Fifth Circuit Court of Appeals held that "statutory removal restrictions" for SEC ALJs "are unconstitutional." 34 F.4th 446, 465 (2015), *aff'd on other grounds*, 144 S. Ct. at 2139 (2024); *see also Fleming v. United States Dep't of Agric.*, 987 F.3d 1093, 1113 (D.C. Cir. 2021) (Rao, J., concurring and dissenting in part) ("Under the text, structure, and original meaning of the Constitution, as well as Supreme Court precedent, it is unconstitutional to insulate Agriculture ALJs with two layers of removal protection."); *Energy Transfer, LP v. NLRB*, No. 3:24-CV-198, 2024 WL 3571494, at *2 (S.D. Tex. July 29, 2024) (holding party "will likely show that the removal protections afforded to NLRB ALJs are unconstitutional").

55. At bottom, because Review Commission ALJs have the same—if not greater—protections on their removal that other courts have found unconstitutional, this Court should hold those removal protections unconstitutional here.

56. **Third**, Kenric Steel is being deprived of its right to a jury trial regarding purely legal remedies sought by the Secretary.

57. Kenric Steel recognizes that the U.S. Supreme Court held in *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977), that the Seventh Amendment did not prevent Congress from assigning to the Review Commission the task of adjudicating alleged violations of the OSH Act and its attendant standards. Nevertheless, the Supreme Court's later opinions effectively overruled *Atlas Roofing*. *See, e.g.*, *Jarkesy*, 144 S. Ct. at 2139. Indeed, the Supreme Court's current reasoning regarding whether the Seventh Amendment requires a jury trial in administrative proceedings is incompatible with *Atlas Roofing*'s holding.

58.     That being said, Kenric Steel recognizes that the Court is bound to follow *Atlas Roofing*. The Supreme Court has clearly pronounced that its decisions are "binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998).

59.     Accordingly, Kenric Steel raises this argument solely to preserve it.

60.     In addition to the constitutional deficiencies described above, the Secretary and the Solicitor, upon information and belief, are prosecuting this matter against Kenric Steel in violation of the OSH Act. Specifically, the OSH Act requires that any civil litigation brought under it "be subject to the direction and control of the Attorney General." 29 U.S.C. § 663; *see also Marshall v. Sun Petroleum Prods. Co.*, 622 F.2d 1176, 1184 (3d Cir. 1980) ("Section 14 of the Act authorizes only the Secretary to conduct OSHA civil litigation, subject to the direction and control of the Attorney General. 29 U.S.C. s 663."). Upon information and belief, neither the Attorney General nor any subordinate within the Department of Justice supervises or directs OSHRC proceedings that seek civil fines, including this OSHRC Proceeding.

61.     The Attorney General of the United States is "the Nation's chief law enforcement officer." *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985). Indeed, under Section 519 of Title 28 of the United States Code, and "[e]xcept as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party[.]" 28 U.S.C. § 519.

62.     No law authorizes the Secretary or the Solicitor of Labor to prosecute Kenric Steel and seek civil penalties <u>without</u> the supervision and direction of the Attorney General. The contrary is true. The OSH Act <u>requires</u> that the Attorney General supervise and direct OSH Act litigation.

63.     Yet because of how the Department of Labor and Department of Justice are currently constructed, upon information and belief, the Attorney General does not supervise or direct OSH Act litigation that occurs before the Review Commission and has not done so in the OSHRC proceeding.

64.     By way of background, the Office of the Solicitor was established by the Organic Act of March 4, 1913, ("Organic Act") with the creation of the Department of Labor as an entity distinct and separate from the Department of Commerce and Labor. The Organic Act provided, however, that the Solicitor sat within the Department of Justice.

65.     As a result, the Organic Act's original provisions that created the Solicitor of Labor position established that the Solicitor would be a subordinate to the Attorney General.

66.     Then, on June 10, 1933, President Franklin D. Roosevelt issued Executive Order 6166 which transferred the Solicitor from the Department of Justice to the Department of Labor.

67.     As a result, and as noted by the official House of Representatives' website, Section 555 of Title 29 of the United States Code now reads as published "[t]here shall be a solicitor for the Department of Labor." That being said, "[t]he words 'of the Department of Justice' were omitted from text on authority of section 7 of Ex. Ord. No. 6166, which transferred the Solicitor for the Department of Labor from the Department of Justice to the Department of Labor." *See* https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title29-section555&num=0&edition=prelim (last visited Sept. 15, 2024).

68.     In other words, but for Executive Order 6166, Section 555 of Title 29 of the United States Code would contain the phrase "of the Department of Justice."

69.     "Of course, an executive order cannot supersede a statute." *Marks v. Cent. Intel. Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978). But that is exactly what appears to have occurred regarding to whom the Solicitor reports.

70.     Kenric Steel has not located any validly enacted law or reorganization plan that lawfully transferred the duties of the Solicitor from the Department of Justice to the Department of Labor.

71.     Today, the Office of the Solicitor has the second largest litigation department in the federal government. The Office of the Solicitor has over 450 attorneys at the National Office in Washington, D.C., and in Regional Offices across the United States who address the many complex legal issues that arise in administering and enforcing more than 180 federal labor laws and their implementing regulations. All Office of the Solicitor attorneys report to the Solicitor, the Department of Labor's third-highest ranking official and chief legal officer.

72.     Except as it relates to the matters before the U.S. Supreme Court or the collection of OSHA penalties, upon information and belief, the Attorney General does not supervise or direct OSH Act litigation that the Solicitor of Labor brings.

73.     More specifically, and upon information and belief, the Attorney General does not supervise the Solicitor of Labor during litigation before the Review Commission.

74.     This wholesale abdication of the Attorney General's congressionally mandated duty to supervise and direct OSH Act litigation as outlined above renders the Solicitor's prosecution of Kenric Steel unlawful.

75.     And while the Attorney General and Solicitor might well come to the "same decision after abiding by the contested procedural requirement," Kenric Steel has standing to ensure that the Solicitor follows the procedures outlined in the OSH Act. *Dep't of Educ. v.*

*Brown*, 600 U.S. 551, 561–62 (2023). Indeed, upon review of the matter, the Attorney General might reach a different conclusion about the merits of the citation items issued to the company.

76.     Ultimately, Kenric Steel brings this action because the Secretary's prosecution of it, through the Solicitor, violates both the OSH Act and the U.S. Constitution, and this Court should enjoin the Secretary and those presiding over the OSHRC Proceeding to prevent Kenric Steel from being compelled to continue to submit to an unlawful process brought by an unlawful prosecutor.

## JURISDICTION AND VENUE

77.     This action arises under the Constitution and laws of the United States. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Kenric Steel's claims that fundamental structural aspects of the OSHRC Proceeding violate the Constitution and the OSH Act. *See, e.g.*, *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 190–96 (2023).

78.     The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and under the Court's inherent equitable powers.

79.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are officers of an agency of the United States acting in their official capacity. A substantial part of the events or omissions giving rise to the claims occurred in this district, because the alleged violations of the OSH Act standards occurred in this district.

## PARTIES

80.     Plaintiff Kenric Steel, LLC is a New Jersey limited liability company.

81.     Defendant the U.S. Department of Labor, Occupational Safety and Health Administration, is an administrative agency of the United States, headquartered in Washington, D.C.

82.     Defendant Julie A. Su is the Acting Secretary of Labor. She is sued in her official capacity.

83.     Defendant Seema Nanda is the Solicitor of Labor. She is sued in her official capacity.

84.     Defendant the U.S. Occupational Safety and Health Review Commission is an administrative agency of the United States, headquartered in Washington, D.C.

85.     Defendant Cynthia Attwood is the Chairperson of the U.S. Occupational Safety and Health Review Commission. She is sued in her official capacity.

86.     Defendant Judge Patrick Augustine is an administrative law judge within the Occupational Safety and Health Review Commission, who presides over the OSHRC Proceeding against Kenric Steel. He is sued in his official capacity.

**FACTS**

87.     Kenric Steel is a family-owned and -operated steel fabrication business specializing in the furnishing and installation of high-quality structural and miscellaneous steel, as well as custom fabrication and installation of manufactured safety and fall protection product.

88.     The America Institute of Steel Construction ("AISC") has certified Kenric Steel in building fabrication, simple bridge fabrication, and highway component fabrication.

89.     AISC Certified companies have been through a rigorous initial evaluation and are subject to annual audits. These evaluations require a comprehensive administrative review, a documentation audit, and an on-site audit of the firm's quality management system.

90.     As noted above, Kenric Steel is committed to ensuring the safety of its employees and all individuals at its sites. It is constantly investing in safety so that it can continuously improve.

91.     To that end, Kenric Steel hired a full-time Safety Director, Robert Cutler, in October 2022 to oversee its safety program.

92.     At the time of his hire, Mr. Cutler was an "OSHA-authorized trainer" and is still identified as such on OSHA's website.

93.     OSHA-authorized trainers conduct 10- and 30-hour OSHA Outreach Training classes in construction, general industry, maritime, or disaster site work.

94.     To become an OSHA-authorized trainer, individuals must have five years of safety experience in the field that they in which to be certified, *e.g.*, construction or general industry. A college degree in occupational safety and health, a Certified Safety Professional, or Certified Industrial Hygienist designation may be substituted for two years of experience. Individuals must also complete specific OSHA courses that cover OSHA policies, procedures, and standards, as well as industry specific safety and health principles. If an individual has fulfilled those perquisites, an individual must also complete an additional OSHA trainer course, where they are briefed on effective instructional approaches and the effective use of visual aids and handouts.

95.     Kenric Steel hired Mr. Cutler to ensure that its safety program went above and beyond the OSH Act's regulatory requirements.

96.     To that end, during his first month on the job, Mr. Cutler provided OSHA 10 training to the Kenric Steel employees who worked at the Millville, NJ location (the "Worksite"). That training included a discussion regarding personal protective equipment ("PPE"), including respiratory PPE. During that portion of the presentation, Mr. Cutler presented on how to select a respirator, medical evaluation, fit testing, and inspection before each use.

- 20 -

97. As an authorized OSHA trainer, Mr. Cutler had the knowledge and expertise to implement Kenric Steel's respiratory program and train its employees on respirator use.

98. Mr. Cutler subsequently resigned employment with Kenric Steel.

99. Following Mr. Cutler's resignation from Kenric Steel, the company still desired to have a best-in-class safety program. That desire led it to retain a workplace health and safety consultant (the "WHS Consultant").

100. Like Mr. Cutler, the WHS Consultant was identified on OSHA's website as an OSHA-authorized trainer.

101. The WHS Consultant began working with Kenric Steel in March 2023. They were engaged to perform the following tasks:

- Manage occupational safety and health programs;
- Implement safety standard updates to the workforce;
- Perform safety and health training for new and current employees, supervisors and managers;
- Perform and record safety inspections and complete an observation/corrective action chart and upload it to the company's OneDrive;
- Send a weekly email listing any safety hazards observed along with corrective actions to be completed;
- Conduct monthly fire extinguisher and eye wash station inspections; and,
- Lead toolbox talks when on site and document the topic covered and who attended.

102. Despite their purported expertise in managing an Occupational Safety and Health program, the WHS Consultant did not provide the services identified above.

103. For example, the WHS Consultant never directed Kenric Steel to perform medical evaluations for those employees who wore respirators pursuant to 29 C.F.R. § 1910.134. Instead, they consistently documented for months that they were researching the issue to determine whether medical evaluations were required.

104. That being said, when the WHS Consultant suggested additional safety or health measures that Kenric Steel should take, Kenric Steel implemented them.

105.    For example, when the WHS Consultant noted Kenric Steel employees should receive certain safety training, Kenric Steel agreed with and implemented her recommendation.

106.    In November 2023, Kenric Steel stopped using the WHS Consultant's services, in part because it determined that they lacked the expertise necessary to perform their contractual duties.

107.    On or about July 26, 2023, OHSA opened an inspection regarding Kenric Steel's Worksite.

108.    Before and during the inspection, Kenric Steel invested financial and other resources into the safety of its employees and compliance with regulatory requirements.

109.    On or about January 22, 2024, OSHA concluded its inspection, and the Secretary issued a Citation and Notification of Penalty (the "Citation"), which contained seven alleged "Serious" and four alleged "Willful" violations of the OSH Act's attendant standards. The Citation proposed a total penalty of $348,683.00.

110.    By classifying four of the alleged violations as "Willful," OSHA alleged that Kenric Steel acted with "'either an intentional disregard of, or plain indifference to, the [OSH] Act's requirements.'" *Bianchi Trison Corp. v. Chao*, 409 F.3d 196, 208 (3d Cir. 2005). To sustain a Willful violation of the OSH Act, the Secretary must show that the employer was actually aware, at the time of the violative act, that the act was unlawful, or that it possessed a state of mind such that if it were informed of the standard, it would not care; a good faith, reasonable belief by an employer that its conduct conformed to the law negates a finding of willfulness. *Dayton Tire v. Sec'y of Lab.*, 671 F.3d 1249, 1255 (D.C. Cir. 2012); *A.J. McNulty & Co. v. Sec'y of Lab.*, 283 F.3d 328, 337-38 (D.C. Cir. 2002) (same).

111.    Many companies simply will not hire or retain contractors who have a Willful violation on their record.

112.    Indeed, thousands of large and small companies manage their compliance risk by retaining vendors, such as Avetta, ISNetworld, and SAP Ariba, who consolidate aspects of third-party risk, including prequalification, safety compliance, sustainability, business risk, and more.

113.    When using these vendors, companies set pre-qualification standards for them to apply to potential contractors, meaning those standards dictate who can obtain work from those companies.

114.    As noted above, many companies' pre-qualification standards prohibit vendors from having Willful violations on their records.

115.    As a result, a Willful citation can serve as the death knell to many small businesses.

116.    And "there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue." H.R. Rep. No. 96–1418, p. 12 (1980).

117.    Let there be no doubt, Kenric Steel vigorously disputes that it Willfully violated the OSH Act or its attendant standards.

118.    While it does not intend to litigate the merits of the Secretary's allegations in this forum, it notes that half of the alleged Willful violations that OSHA cited it are among the top ten most cited standards. https://www.osha.gov/top10citedstandards (identifying Hazard Communication and Respiratory Protection as two of the top ten cited standards) (last visited Sept. 15, 2024).

119.    In other words, when OSHA inspects a business, including small businesses, those are the violations that it is most likely to find or cite.

120.    To preserve its rights, Kenric Steel filed a timely Notice of Contest to the Citation on February 7, 2024, a necessary procedural step to ensure that the Citation does not become a final order.

121.    On February 20, 2024, the Department of Labor issued a press release touting the Citation and fines OSHA issued to Kenric Steel, despite Kenric Steel having contested the citations. *See* U.S. Dept. of Lab., *New Jersey steel fabrication company fined $348K after federal safety inspectors find employees exposed to workplace hazards*, https://www.dol.gov/newsroom/releases/osha/osha20240220 (last accessed Sept. 15, 2024).

122.    OSHA alleged in the press release that Kenric Steel "failed to correct the hazards" identified by the WHS Consultant.

123.    As noted above, the WHS Consultant did not inform the company that it was in violation of the applicable standards.

124.    That press release, which contains only OSHA's allegations, remains publicly available and unjustly tarnishes the company's reputation.

125.    Due to the size of the proposed penalty, Kenric Steel was required to participate in the Review Commission's mandatory settlement procedure.

126.    Kenric Steel participated because it hoped that it could resolve the matter without expending any further resources. The mediation was unsuccessful.

127.    On June 17, 2024, the parties to the OSHRC Proceeding received notice that Defendant Judge Augustine had been assigned to the case to preside over discovery and hear and decide it.

128.    The Secretary filed a Complaint with the Review Commission on July 21, 2024, which Kenric Steel answered on July 31, 2024.

129.    In its Answer, Kenric Steel raised a defense that the Review Commission's proceeding was unconstitutional for the reasons set forth above and below. Defendant Judge Augustine unexpectedly then ordered Kenric Steel to brief the issue. In response to that Order, Kenric Steel moved for Judgment on the Pleadings on August 15, 2024. The Solicitor requested until October 7, 2024 to respond to that Motion, and Defendant Judge Augustine granted that request.

130.    On September 16, 2024, the Secretary, through the Solicitor, agreed to stay the OSHRC Proceeding during the pendency of this matter. That being said, Defendant Judge Augustine will also have to grant Kenric Steel's forthcoming motion for the stay in order for the company to avoid being subjected to an unconstitutional agency proceeding during the pendency of this matter.

131.    The ALJ hearing is currently scheduled to begin May 5, 2025.

### COUNT I – MEMBERS OF THE REVIEW COMMISSION ARE UNCONSTITUTIONALLY INSULATED FROM REMOVAL

132.    Kenric Steel restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

133.    The Review Commission's Members may be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office." 29 U.S.C. § 661(b).

134.    Yet the Review Commission's Members exercise substantial executive power under the Constitution in administering, adjudicating, and enforcing the provisions of the OSH Act.

135.    The Review Commission "functions as a two-tiered administrative court, with established procedures for (1) conducting hearings, receiving evidence, and rendering decisions by its Administrative Law Judges (ALJs) and (2) discretionary review of ALJ decisions by a panel of Commissioners."

136.    In this and other ways, the Review Commission wields substantial policymaking and adjudicative authority.

137.    The Supreme Court has made clear, moreover, that even when "the activities of administrative agencies 'take "legislative" and "judicial" forms,' 'they are exercises of—indeed, under our constitutional structure they must be exercises of—the "executive Power."'" *Seila L.*, 591 U.S. at 216 n.2 (citation omitted).

138.    Being subject to unconstitutional agency authority—including proceedings before unconstitutionally insulated agency officials—qualifies as a "here-and-now injury" under well-settled precedent. *Axon Enter.*, 598 U.S. at 191 (citation omitted).

139.    Kenric Steel is "entitled to declaratory relief sufficient to ensure that the [administrative] standards to which [Kenric Steel is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.

140.    Moreover, without interim injunctive relief from this Court, Kenric Steel will be required to undergo an unconstitutional proceeding before an insufficiently accountable agency official.

141.    Kenric Steel bears a strong likelihood of success on this claim for the reasons detailed above.

142.    Yet, unless the Review Commission is enjoined from proceeding against Kenric Steel before a Review Commission whose Members are unconstitutionally insulated from presidential oversight, Kenric Steel will be irreparably harmed.

143.    Further, if Defendant Judge Augustine's determination becomes the Review Commission's final order against Kenric Steel, the harm will likely be irremediable because of the difficulty of obtaining retrospective redress for an unconstitutional proceeding by improperly insulated administrative agency officials. *See Collins*, 594 U.S. at 256–60. 63. The harm to Kenric Steel, in the event declaratory and injunctive relief is not granted, far outweighs any harm, or mere inconvenience, to the Review Commission if such relief is granted.

144.    The grant of injunctive and declaratory relief on this claim will serve the public interest by protecting Americans' constitutional rights.

**COUNT II – REVIEW COMMISSION ALJS ARE UNCONSTITUTIONALLY APPOINTED AND THEN UNCONSTITUTIONALLY INSULATED FROM REMOVAL**

145.    Kenric Steel restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

146.    Being subject to unconstitutional agency authority—including proceedings before unconstitutionally insulated agency officials—qualifies as a "here-and-now injury" under well-settled precedent. *Axon Enter.*, 598 U.S. at 191 (citation omitted).

147.    Merely being subject to a hearing and decision in proceedings before an unconstitutionally appointed and unconstitutionally insulated ALJ causes Kenric Steel ongoing harm.

148.    This harm exists even if a President does not actively desire to remove a particular ALJ, because the mere potential for removal influences how rational ALJs carry out their duties. After all, Congress sought to make Review Commission ALJs politically independent for a

reason: it wanted to insulate them from political pressures. *See, e.g.*, *Lucia*, 585 U.S. at 260 (Breyer, J., concurring in the judgment in part and dissenting in part).

149.    In addition, a showing of particularized cause and effect between the appointment process and removal restrictions and ALJ actions is unnecessary to declare that the appointment process and removal restrictions are unconstitutional.

150.    Kenric Steel is "entitled to declaratory relief sufficient to ensure that the [administrative] standards to which [Kenric Steel is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.

151.    Without interim injunctive relief from this Court, Kenric Steel will be required to undergo an unconstitutional proceeding before an unconstitutionally appointed and insufficiently accountable agency official.

152.    Kenric Steel bears a strong likelihood of success on this claim for the reasons detailed above.

153.    But unless Defendants are enjoined from proceeding against Kenric Steel, Kenric Steel will be irreparably harmed.

154.    Deprivation of an individual constitutional right is often an irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and having to appear in unconstitutionally structured agency proceedings is an injury that cannot be remedied once the proceeding is over, *Axon Enter.*, 598 U.S. at 191.

155.    The harm to Kenric Steel, in the event declaratory and injunctive relief is not granted, far outweighs any harm, or mere inconvenience, to Defendants if such relief is granted.

156.    The grant of injunctive and declaratory relief on this claim will serve the public interest by protecting constitutional rights.

## COUNT III – THE ALJ'S ADJUDICATION OF THE CITATION WITHOUT A JURY TRIAL VIOLATES THE SEVENTH AMENDMENT AND ARTICLE III

157.    Kenric Steel restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

158.    The Seventh Amendment provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. CONST. amend. VII.

159.    This provision protects the jury's role "as a fact-finding body" and entitles parties "to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

160.    "The Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2128 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). "To determine whether a suit is legal in nature" courts are "to consider the cause of action and the remedy it provides." *Id.* at 2129.

161.    Here, much as in *Jarkesy*, the "remedy is all but dispositive." *Id.*

162.    The Secretary:

> seeks civil penalties, a form of monetary relief. While monetary relief can be legal or equitable, money damages are the prototypical common law remedy. *See Mertens v. Hewitt Associates*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to "restore the status quo." *Tull*, 481 U.S. at 422, 107 S.Ct. 1831. As we have previously explained, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (internal quotation marks omitted). And while courts of equity could order a defendant to return unjustly obtained funds, only courts of law issued monetary penalties to

> "punish culpable individuals." *Tull*, 481 U.S. at 422, 107 S.Ct. 1831.
> Applying these principles, we have recognized that "civil penalt[ies
> are] a type of remedy at common law that could only be enforced in
> courts of law." *Ibid.* The same is true here.

*Id.*

163.    To start, the OSH Act conditions the size of the civil penalty on: (1) the size of the

business of the employer being charged; (2) the gravity of the violation; (3) the good faith of the

employer; and, (4) the history of previous violations. 29 U.S.C. § 666.

164.    "Of these, several concern culpability, deterrence, and recidivism. Because they

tie the availability of civil penalties to the perceived need to punish the defendant rather than to

restore the victim, such considerations are legal rather than equitable." *Jarkesy*, 144 S. Ct. at

2129.

165.    The criteria that separate the tiers of civil penalties under the OSH Act likewise

are legal in nature. Congress set one maximum for "Serious" and "Other-Than-Serious" penalties

but multiplied that maximum by ten for "Willful or Repeated" violations. 29 U.S.C. §666(a)-(c).

These two tiers:

> condition[] the available penalty on the culpability of the defendant
> and the need for deterrence, not the size of the harm that must be
> remedied. Indeed, showing that a victim suffered harm is not even
> required to advance a defendant from one tier to the next. Since
> nothing in this analysis turns on "restor[ing] the status quo," *Tull*,
> 481 U.S. at 422, 107 S.Ct. 1831, these factors show that these civil
> penalties are designed to be punitive.

*Jarkesy*, 144 S. Ct. at 2129-30.

166.    "The final proof that this remedy is punitive is that the [OSHA] is not obligated to

return any money to victims." *Id.* at 2130. "Such a penalty by definition does not 'restore the

status quo and can make no pretense of being equitable.'" *Id.* (quoting *Tull*, 481 U.S. at 422).

167.    Thus, because "the civil penalties in this case are designed to punish and deter, not to compensate," they are "'a type of remedy at common law that could only be enforced in courts of law.'" *Id.*

168.    Kenric Steel therefore has a right to have a jury decide whether it is liable to Complainants and the extent of any damages. *See, e.g.*, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962).

169.    Without interim injunctive relief from this Court, Kenric Steel's claims will be improperly adjudicated by an administrator instead of a jury in an Article III court.

170.    Unless Defendants are enjoined from moving forward with the OSHRC Proceeding in place of an Article III proceeding before a jury, Kenric Steel will be irreparably harmed.

171.    Deprivation of an individual constitutional right is often an irreparable injury—even for minimal amounts of time. *Elrod*, 427 U.S. at 373.

172.    And having to appear in unconstitutionally structured agency proceedings is an injury that cannot be remedied once the proceeding is over. *Axon Enter.*, 598 U.S. at 191.

173.    The harm to Kenric Steel, in the event declaratory and injunctive relief is not granted, far outweighs any harm, or mere inconvenience, to Defendants if such relief is granted.

174.    The grant of injunctive and declaratory relief on this claim will serve the public interest by protecting constitutional rights.

**COUNT IV – THE SOLICITOR OF LABOR'S UNSUPERVISED PROSECUTION OF KENRIC STEEL VIOLATES THE OSH ACT**

175.    Kenric Steel restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

176.    Upon information and belief, the Secretary, through the Solicitor, is prosecuting the matter against Kenric Steel contrary to the explicit command of the OSH Act that the litigation "be subject to the direction and control of the Attorney General." 29 U.S.C. § 663; *see also Sun Petroleum Prod. Co.*, 622 F.2d at 1184 ("Section 14 of the Act authorizes only the Secretary to conduct OSHA civil litigation, subject to the direction and control of the Attorney General. 29 U.S.C. s 663.").

177.    While the Attorney General and Solicitor of Labor might well come to the "same decision after abiding by the contested procedural requirement," Kenric Steel has standing to ensure that they follow the procedures outlined in the OSH Act. *Dep't of Educ. v. Brown*, 600 U.S. at 561–62. Indeed, upon review of the matter, the Attorney General might reach a different conclusion about the merits of the citation issued to the company.

178.    If, for example, the Attorney General concludes, based upon his review of the evidence, that the Secretary misclassified even one of the Willful violations, Kenric Steel's exposure would decrease by ~$75,000.

179.    Without interim injunctive relief from this Court, Kenric Steel will be subject to an illegal prosecution by the Solicitor.

180.    Unless the Attorney General directs and supervises the OSHRC Proceeding, Kenric Steel will be irreparably harmed by the Secretary and Solicitor's violation of the OSH Act. The company will never know if a legal prosecution with the Attorney General's direction and supervision would have resulted differently.

181.    And having to defend itself in prosecution brought by a prosecutor in violation of the law is an injury that cannot be remedied once the proceeding is over. *Cf. Axon Enter.*, 598 U.S. at 191.

182.    The harm to Kenric Steel, in the event declaratory and injunctive relief is not granted, far outweighs any harm, or mere inconvenience, to Defendants if such relief is granted.

183.    The grant of injunctive and declaratory relief on this claim will serve the public interest by protecting employers' statutory rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Kenric Steel hereby requests that the Court order the following relief and enter a judgment:

1.    Declaring that:

    a.    The statutes, regulatory provisions, guidance, and/or policies restricting the removal of Review Commission Members are unconstitutional;

    b.    The statutes, regulatory provisions, guidance, and/or policies regarding the appointment of OSHRC ALJs, including Defendant Judge Augustine, are unconstitutional;

    c.    The statutes, regulatory provisions, guidance, and/or policies restricting the removal of OSHRC ALJs, including Defendant Augustine, are unconstitutional;

    d.    The OSHRC Proceeding against Kenric Steel unlawfully deprives Kenric Steel of its constitutional right to trial by jury in an Article III court; and

    e.    The Solicitor of Labor is prosecuting the matter against Kenric Steel in violation of the OSH Act that the litigation "be subject to the direction and control of the Attorney General." 29 U.S.C. § 663;

2.    Preliminarily enjoining Defendants from subjecting Kenric Steel to unconstitutionally structured and illegally prosecuted administrative proceedings pending the final resolution of this action;

3.      Permanently enjoining Defendants from subjecting Kenric Steel to unconstitutionally structured and illegally prosecuted administrative proceedings;

4.      Preliminary, and thereafter permanently, enjoining the Secretary and the Solicitor from prosecuting Kenric Steel without the direction and supervision of the Attorney General;

5.      Awarding Kenric Steel its costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney's fees; and

6.      Awarding such other and further relief, whether at law or in equity, as the Court deems just and proper.


Dated: September 17, 2024                Respectfully submitted,

                                         /s Brandon J. Brigham_____

                                         MORGAN, LEWIS & BOCKIUS LLP

                                         Brandon J. Brigham
                                         brandon.brigham@morganlewis.com
                                         2222 Market Street
                                         Philadelphia, PA  19103
                                         Telephone:     +1.215.963.5000
                                         Facsimile:     +1.215.963.5001

                                         *Counsel for Plaintiff*
                                         *Kenric Steel, LLC*